The issue in this case, as it is in all Terry cases, is whether the facts available to the officers would allow a person of reasonable caution to believe that their actions are appropriate. That's a reasonableness standard undergirding all of Terry. And here are what the facts that the officers knew. On Wednesday night... And I'm going to just ask you to be very clear since the stage at which we're discussing this encounter probably matters to some anyway. You're talking about the initial move to take the sharp left turn and go up and confine the car. You're not talking about anything later? Definitely. We're talking first about the seizure that takes place and what they observed. That was the seizure conceded by the government and found by the district court. That's correct. That seizure and the facts that the officers knew at that moment are they look to the left and in front of an open store they see a car stopped. The lights are on, it's occupied, exhaust is coming out and it's there. And no driver. No, that's actually a great question. They don't observe that. That was a huge part of disagreeing. The facts in both cases said no driver. There was no driver, but when the officers observed, they don't make that observation. So when they make the decision to see... So you're saying they're too far away at that point to know if there's a driver. They find it out later. That's exactly it. Are you bringing that from the record, I guess? You can look at page 65 of the transcript. The record is very clear. That's not in the briefs, but it's in the record. I don't know if it's not in the briefs. Believe me, it's not in the briefs. That's not in the briefs. Why? Good answer. Pardon? I said good answer. Thank you. Hopefully there are more to come. That observation, that there was no driver, that only comes after the initial seizure, after the box-in. At that point, all the officers know is that there's a running car. But they can see, can't they, that it's roughly eight feet from the crosswalk, not 15. They must be able to eyeball a difference that's that big. Yes. But there's nothing illegal at that point. There's nothing illegal about a car stopped, standing, with its lights on, and being occupied. That's presumptively illegal under Wisconsin law. I don't think it's presumptively illegal. I think it's illegal if they're not there for that purpose. Well, that's the exception. If they're there for unloading, then there's not a violation. But it's presumptively illegal under Wisconsin law to park within 15 feet of a crosswalk. Period. Full stop. Except for the purpose of unloading and loading. Right. But the officers under well-established case law, the officers aren't required to negate an explanation that might prove the conduct innocent. If they see a violation, they can stop the car. They can do a traffic stop. This is far distinguishable from those kinds of cases. And it would run in the face of Pena Agua Garcia. Wouldn't the natural assumption be that someone in the car had run into the liquor store to get something and was going to bring back? Would they assume if you saw the car with the lights on, it's next to a liquor store, it's at night, it's in the winter? That's the most plausible explanation right there. That's what everyone would assume. I want to just, you know, given the wide number of scenarios in which parking violations can occur, Is this issue capable of any categorical resolution, such a determination that parking violations always or never can support a seizure, do you think? That's a difficult question. Why do you think I asked? Because you're a really good judge. I was asking the easier ones earlier. I'm glad you saved it up for me. Here's the simple answer. Common parking violation, never a seizure. By that I mean the meter is expired or, you know, you're parked too close to the curb or too far away from the curb. Never. There is no reason that the officers have to seize at that point. Here's where it becomes tricky. But it is a parking violation. I understand that under Milwaukee law, even though it's maybe not common for the police to enforce the parking rules, they're empowered to do so. They can. And they testified that they, with some regularity, do. Even if it's an expired meter or, you know, you're parked 24 inches from the curb because you're a bad parallel parker instead of 18 or whatever it is. Correct. We've never contested the fact that they can do that. But they just can't seize. They can't seize in the sense of the seizure that took place here. So are you conceding that if Officer Conway had walked up to the car, granted it was a cold night but we're all tough in the Midwest, and so he walks up to the car and then sees everything else that he saw. He sees Johnson squirming around with a gun. You don't have a case if that happened. Because simply walking up to the car and peering in through the window, it's hard for me to imagine that as a seizure. Can I answer the question and give a caveat? The answer is yes. We would agree if it was a voluntary encounter. But his movements are sparked by the seizure. It's not a matter of he just walked up to the window and said, hey, buddy, you got to move the car. And Johnson suddenly flips out at that. No, this is you have two cars boxing. I understood the question to be somewhat different. It's a single officer walks up to the car and says, you were parked too close. I'm going to write you a ticket. Do you think at that point the car, if there were a driver, do you think the driver could just accelerate away and say, no, you're not. No, I'm leaving. No. All right. That means you think walking up to the car is itself a lawful seizure. Because a lawful seizure means a prohibition on walking away. No, I think it's actually distinguishable, and that's where I was trying to get with Judge Robner's question, is that that is actually incidental. That's where we all agree. Even the cases we cite that say you cannot seize for a parking violation, the Minnesota Supreme Court and the Washington Supreme Court. They all agree. Once a ticket's being written, nobody can walk away. I guess that's where you lose me, because that is a seizure for a parking violation. If there's a legal rule against departing, then you've been seized. How does one get around that? If writing the ticket is part of the administrative duties of enforcing the traffic. I don't mean you have to start physically writing the ticket. The guy walks up and says, you are parked too close. I'm going to issue a ticket. And before he gets out his ticket book, the person drives away. I take it you agree he can't. That he can't? That he can't drive away just because the officer hasn't got the ticket book out of his hip pocket yet. I agree with that. I suppose, then, you're saying a seizure is perfectly lawful. Because if that's not a seizure, what's a seizure? A seizure is definitely this, where you drive up with two cars and the spotlights, and five people get out. We know that. The question is whether the very act of investigating a parking violation and walking up to the car does not also seize the car and its owners until the incident is concluded. Or we could even say the apparent parking violation. They're loading. So there's no presumption of a violation. They're loading or unloading. That's correct. Our position is this five to eight to ten seconds of observation isn't enough to decide whether or not they're loading or unloading. Go ahead, Your Honor. I want to focus in on how does the show of authority factor into the analysis? Because, you know, when we determine whether a seizure is reasonable under the Fourth Amendment, we have to consider both the governmental interest at issue in enforcing the parking violation, but we also have to consider the degree of force as part of the analysis, you know, as to the degree of intrusion. No question. So, for instance, could a stop be constitutional if it involved just a couple of officers stopping a person to ask questions? But unconstitutional if it involved a full SWAT team sweeping down on the persons with their guns drawn? No, I don't question that. I think when you have to balance, which Hensley tells you you have to do, you can't come. If the governmental interest is I really want to keep people 15 feet from that crosswalk, then you're not allowed to come with the SWAT team to go and investigate that. That actually takes it outside of what you're really investigating at that moment. That show of force is incommensurate with what you're investigating there. So it's an important part of your theory then that even if in our hypothetical that we've been talking about, walking up the difference isn't just could you write the ticket, but there's actually an independent component in the Fourth Amendment that relates to the excessive force dimension of this particular seizure. I think that's always balanced within Terry. Every case under Terry tells you you have to balance the governmental interest, what you're investigating, and what the person. If all Terry stop people, or if a Terry stop was underway and the officer decided, actually I'm going to shoot you in the thigh because I know that will disable you while I pat you down, you would say that even though the legitimate pat down would be okay, that's excessive force. I would agree with that, yes. And I take it, well, I should take nothing for granted today. Would you concede that a seizure akin to a Terry stop would be appropriate for some parking violations, in particular the violations that would raise serious safety concerns if a car was stopped in a no parking zone near a high parking building or populated event like, I don't know, Times Square on New Year's Eve? Would it be constitutional to seize the individual to investigate that kind of parking violation? And that's why I said the ordinary, we agree, we say no, you cannot seize for that. But the extraordinary, the court would have to balance with the officer and say, look, the safety interest of Times Square on New Year's Eve, we've got to find out, buddy, what are you doing here? And that goes more to the community caretaking than anything, but it's part of every factor that you have to look at. So you're not advocating a blanket rule? No. You're saying there are exceptions to the rule where there is a public harm, potential public harm? Yes. And I think you'd also have to wed that to the fact that a lot of it is just cops trying to direct traffic. You know, like, I live in Madison, and when you go, you have one big main boulevard that goes through. And they're towing at 801. Everybody's getting towed. There's clearly a seizure going on there. But when the officers aren't going to allow that to obstruct the traffic, because once they do, that place is just gridlocked. And everybody has a bad day, and you're upset, and everything else. So officers are normally, they're just trying to direct traffic. Well, there was snow, and the snow piled. Was there snow piled away from the curb, into the street? So if you look at the, I believe it exhibits F and R, the pictures, you can see it. Now, we all come from the Midwest, so we have different concepts of how high a snow pile is. This one is clearly a snow pile. It's a sort, you have the very convenient, which we all love, is when the convenience store has, like, look, you can actually, they've snowblown one of those walkways. And that's where the car is parked. The car is parked. It's not parked along the curb. It's parked in the street. No, no, no. So it's not gone to 24 inches. I know exactly what you mean. And I quite often park that way. So, no, it hasn't pushed that over into traffic. No, it's, you can see the curb. Milwaukee has great snow piles, and they got right there. So it's within the, I think it's 18 inches that you have to park there. Was the path behind or in front of the car? It was actually to the rear tire. If you want, I got a picture here, if you want me to pass them up. I'm looking for it. But it's right there. And then there's a second path, because it's an angled street, and you have, so you have two paths. But the one that the person who's going into the liquor store goes through is the one right there, right behind the rear tire. Did somebody go into the liquor store? Yes. The driver of the car, who they didn't know about until after this, was the one who went into the liquor store. She owned the car. It was my client's sister. His other sister was in the front seat. So she comes out moments later and says, hey, what's going on? Kind of surprised for a parking violation. So to get back actually to the core question, and I don't want to lose this, because I really want to address this. If you look at Shields, Shields seems almost unremarkable. Because everything they're doing, when they seize the person, the court finds it's a seizure. And I would say it's dicta, the need to decide that seizure. But it looks like a voluntary encounter. In fact, the defendant, the defendant says, it was a voluntary encounter. I wasn't seized. I voluntarily got out of the car. That's what most of what we're talking about. On the low end of Terry, it's going to be indecipherable from a seizure. A seizure and a voluntary encounter are going to have many of the same aspects. And that's where, when you have that scale, you say, okay, this is legitimate. When it's just like, hey, buddy, what are you doing? Would I feel free to leave? I don't know. I usually respect the cops. I do whatever I'm told. But on the high end, where you say, you can't come with a SWAT team. You can't come with four cops for this parking violation. Mr. Barney, would it be fair to say that the behavior of the police here, if it had been five civilians in two cars with those lights and the aggressive approach, would have amounted to a tort of assault? Oh, agreed. No question. Putting people in fear, it's an intimidating show of, in this case, of authority. But if it's private civilians, of really intimidating people without a badge. Right? No question. I mean, this would be a scary scene by every step of the, you know. When you think about the flood lights coming, being boxed in, and then it's all for that, you know, hey, buddy, come on. You've got seven more feet to go. Does it make any difference what time of day it was and it was a liquor store? Well, I think it makes a big difference in that it gives the benefit to, he's going to the liquor store. Now, in Milwaukee, you're actually all the time. All right. Is this the high crime area? Yes. I'll give you it. And it's a liquor store. Yep. And there's a car parked out in front. Yes. At 745 or whatever time. 741. So it was dark. Yep. During normal hours when people go to get liquor on a Wednesday evening. Okay. Let me ask you this. How much time do you think needed to pass before the officers could have ruled out the loading and passenger discharge exception? So I think that reasonableness, you'd say two or three minutes. You know, some cases you might say five minutes. If it has a Jimmy John's sandwich sign on top of the car, I'm going five minutes. You know, if I'm in front of Starbucks, how long does it take for a latte? Half an hour. And that whole time, unloading and unloading. I'm okay to be there. Because my lights are on, my car is occupied, and I'm just standing there. And that's perfectly illicit. Now, to take that inference that it's going to be a, that's a stick-up job, I think you've got to go right back to Terry. There, that officer did exactly what we want. He observed 24 trips. He did what he should do, and that's what he waited, he observed. But that's not a traffic stop case. You know, we're in the traffic stop domain here, which is a species of Terry stop. It doesn't require criminal activity. A parking violation, like any kind of traffic violation, is enough to initiate an investigation, a temporary detention. And that's what happened here before the sort of movements hiding the gun was noticed. I agree that, like, you have the right to investigate, but the investigation is just observation. It doesn't need to be the seizure at that point. Because at this point, all you have is suspicion, but you don't have reasonable suspicion. It's no different than Santiago. Now, do you accept that a traffic stop and a parking stop are the same thing, or is there any reason to distinguish them that you can find in Supreme Court decisions? I think that they are distinguishable. And here's the real big one. A traffic stop goes to an individual. I am speeding. Or if you go back to this court's decision in Childs, you don't have your seat taken. But a parking violation is an in-rem offense. You don't get a parking violation to Joe Budman. You get a parking violation to 516 TUV beat-up Honda Accord. And that's exactly what you're, you know, it's going in-rem. So the ability to arrest, unlike with a traffic stop where you're speeding under La Vista, you can arrest them. Under a parking violation, the same thing doesn't hold true. It's also not a crime in Wisconsin. It's actually just a forfeiture. So a forfeiture is not a criminal act. So that takes it outside the realm that we'd say this is exactly what you're dealing with here and that it's analogous to. But there's all kinds of non-criminal traffic laws, including all kinds of non-criminal parking violations. There's a whole different variety. And there's no requirement, wait-and-see requirement, before the officers are entitled to investigate once they see the prima facie violation. I think in most cases, when it comes to parking, it's not even prima facie. We just know. You know, the meter's expired. There's throwaway zones. I mean, there's lots of parking laws. All forfeitures, all non-criminal. The officer doesn't need to let a certain amount of time pass to determine whether this actually has an innocence explanation. The case law doesn't require that, nor does a general understanding of reasonableness under the Fourth Amendment require that. Well, that's because all those are specific to the violation. You can see it right away. I see the red flag is up. And so then I'm like, okay, your meter's expired, buddy. Or in Shields, you're parked right in the middle of the crosswalk. So I can see it right there. You could never be in Shields there. And so those, you don't need any more investigation. But here, you need to do some investigation. It's no different than the texting. What am I doing? Am I texting or am I going on Google Maps? One's illegal and one's legal. Throwaway zones. Lots of unless clauses in throwaway zone laws. Sure. Do they have to wait and negate, if they see a car in a throwaway zone, they have to wait and rule out all of the innocent explanations that might take it outside the violation? No, there's two different kinds of throwaway zones. We both know that. That's where the question's going. So I want to make sure I don't get tripped up. The ones where there's an emergency, you've got the fire department, and you're not allowed to be right in front of there. You know what? It doesn't take much to knock on the window and say, move it along. That's okay to move in right away. Yeah. Eight-second delay, five-second delay. Well, is it parked? I mean, that's the other thing, too. If nobody's in there, or the guy's homeless and he's sleeping in the backseat, well, the car is parked. It's parked. It's not standing. It's not stopping so that somebody can load and unload. Here, you have it where you have none of those indicia. There's somebody parking. Now, I'd also say, going back to my point, the caveat is, a lot of that's community caretaking. It's not that you're doing a criminal investigation. You're not Terry stopping. You're saying, look, I just got to move the traffic along. I'm calling the tow truck. Vinnie's going to be here in two minutes, and we're going to move it along. Right, but the subjective intent of the officers doesn't matter. So what they think they're stopping for doesn't really matter. No question. So if they think they're stopping to move the car along and do a community caretaking kind of investigation, or if they think they're doing an investigation for drug dealing, it doesn't matter. It matters if there's an objective basis for the stop. Exactly, and that's what you need. You need the objective. We're not saying you overrule RAP. We're just saying you've got to play by the rules. You've got to get to probable cause. You've got to get to reasonable suspicion. You have to have enough time of that observation to make your suspicion reasonable. And if you don't get there, it's not objectively reasonable. And that's what it is right here, is that you haven't allowed to develop the facts that you would need to make that call, whether it's reasonable suspicion, that that person is actually not unloading or loading, and that person is actually parked there. And you can't make that until you observe longer, until you actually go and see. Whether it's two trips around the block, whether it's sitting there across the street and observing for two minutes, whether it's just walking up as a casual encounter. We're not asking the court to say, like, it has to be one or the other. We're just saying that has to be done. You can't come in with five police officers, two squad cars and box somebody in after five to 10 seconds of observation. Counsel, it's been an assumption of this part of your argument, that if the use of two cars was an excessive show of force, since no force was actually used, if it's an excessive show of force, then exclusion of evidence follows. Does any case in the Supreme Court support that proposition if the same evidence would have turned up without excessive force? Now, the comparison is the officer walks up to the car, and you concede the car can't drive away. Is there any support in the Supreme Court for saying if excessive force was used, that the evidence must be suppressed, rather than, for example, used as an award of damages? Sure. By the question, I know that there is no answer that gives to the walking up. But I will say that you look at... No, I'm just interested in whether the Supreme Court has ever held that an excessive use of force justifies exclusion of evidence as opposed to an award of damages. No, they've never. Never. No. The theory is that it's unreasonable seizure, right? Exactly. Sorry, Your Honor. Well, in January of 2014, was it criminal for... We know Mr. Johnson couldn't lawfully possess a firearm. But unless you knew somebody's criminal record in January 2014,  Yes, if they had a CCW permit. If they had a permit. Yes. Any kind of weapon? No, you wouldn't be allowed to have an Uzi or an assault rifle, anything under 28 U.S.C. 586. How about the 20-shell clip? The extended clip? I don't believe that in itself is illegal. I mean, I know that's a sentencing enhancement factor, but the extended clip itself is not illegal. Was this, the sidewalk itself, was that cleared through the snow? To the alleyway. So the alleyway is going to be, if you go on Google Maps, it's probably an extra 10 feet up. So, yes, the sidewalk is cleared out. It's a corner, corner lot. And the car had actually covered up at that point, temporarily, while it was parked there, the cut-through that the store owner made. There were two cut-throughs. So there's a cut-through at one of the angles, right, where the streets come together. And then there's a second cut-through four feet over. And that was one that the car covered that. Yes, Your Honor. Yeah. Nothing illegal about covering that. And, again, this is an unmarked crosswalk. To get back to your question, though, Your Honor, though the Supreme Court has not said it, it goes back to the basics of weeks and that. It's that the police have been involved or engaged in illegal activity, and the evidence is derived directly from that. It's not that they couldn't have gone and got a warrant in weeks and gone through his papers. Or with Ms. Mapp's house. Actually, counsel, the case I was particularly thinking of is Hudson against Michigan, where unlawful force was plainly used in order to enter the house. Instead of knocking and announcing, as the Constitution requires, the police just knocked down the door. The Supreme Court assumed that that was excessive force, an unreasonable entry, and nonetheless held that the evidence must not be suppressed, that the remedy is damages, because if they had knocked and announced, they would have found the same stuff. And the question I'm asking is, why isn't that the general approach? For excessive force, we have damages remedies. Where do they have a warrant? Well, let me ask you a different way around that question. Suppose you agreed with Judge Easterbrook. Yeah, that's what Hudson said. On the facts of this case, is it clear that the gun would have been found anyway? No, definitely not. That also is the government's burden. If they want to establish inevitable discovery, they need to prove it by preponderance of evidence, and they need to set forth that causal chain. For us to hypothesize, or for us to now try to second guess, and what would be Mr. Johnson's response to being seized with two cars in the spotlights, or somebody going and knocking on the window, well, that's where the government would do it, in front of the district court. They never did it. So we don't have that record to be able to make that inevitable discovery argument. So I think it's far from clear, and I would ask that the court not rest its decision on that. And I'm going to just warn you that you're in rebuttal time, but feel free to answer Judge Easterbrook's question. So the knock-and-announce case is prophylactic. That's what they say. It doesn't go down to the constitutional right. And in that case, they had a warrant. So they'd already gone through all the... That wasn't the court's point. The court's point was that the unlawful entry, or the unlawful force, was not in the chain of causation to finding the evidence. Now, that drives us back to Chief Judge Wood's question. We would need to figure out whether the appearance of two cars, if that's unlawful, an unlawful show of force, was in the chain of causation. And there they had a warrant. So the chain of causation... The Supreme Court's decision in Hudson has nothing to do with a warrant and everything to do with causation. But you've also... I'm just going to ask you to maybe save this, but I think when you answered my question, you said that the record isn't there to show. You said, as I understood you to say, that the record in this case isn't there that the gun would have been found had it not been for the cars zooming in and boxing up. That's correct, Your Honor. I think it would be exactly the opposite. I think that's your response. Let me ask you this. Are you challenging the fact that two patrol cars in a high-crime area travel together? No. You keep talking about this boxing in. There are two cars. The fact that they're not sequential, is that something? Should they park behind each other? Somehow would it be a lesser show of force? Well, I think... It's like two-man cars rather than one-man cars, right? No. Look, if they wanted to park across the street and walk over, and they wanted to engage in a casual encounter, that's one thing. But it's a show of force. It's the boxing in. It's what's reasonable when it comes to a parking violation. We have no problem with the NFP, the Neighborhood Task Force. And they're allowed to go and look around and drive around to have that. But when they don't engage in parking violations with that type of show of force, it has to be balanced. That's what the Supreme Court has always dictated. Your brief indicates... Again, I go to the brief rather than what the record shows. Officers could see the shapes of several individuals through the vehicle's tinted windows. The government says they could see them, which is right. Could they see through the windows when they walked up? I mean, the windows are tinted. Now, the district court gave... Because your question is a good one. There is the liquor store light, all right? Then you also have the lights from the two squad cars, all right? You have a tinted window at just the liquor store without the seizure? Probably not. Now, I'm just hypothesizing there. But if you have the seizure with all the lights on, which is really the critical point, all right? That's when they say, yeah, we could see it at that point. Because our argument in the district court, the evidentiary hearing, was different. Our argument was Kaiser opens the door, so the dome light comes on, and he has the flashlight. And that's when they see everything. That's the reaction. And when you think about what Mr. Johnson is doing, that's a reaction somebody has to, like, you know, a flashlight. Spotlight in your face. You're like, whoa, hey, what's going on? And that's the moment of seizure that we kept on going back. Well, here's what the brief says. This is a government brief, which I'll ask him about. When the officers got out of their squad car, Officer Conway saw Johnson, who was a left passenger of the SMV, lean back and move both hands toward the waist. And earlier they said Randy Johnson saw... He saw Randy Johnson inside the SUV with a gun. My statements were, this is all post-seizure. So, like, they boxed him in at that point. This is the constitutional... Okay, right. Post-seizure. He's walking up to them. To answer your question, yeah, through it, when all the lights are on, when they have the squad lights on, when they have all the, you know, the beams on, then they can see it. But if you were to say, we take away the beams, we take away the seizure, I don't think you're seeing, one, you're not prompting that kind of sudden movement. One car is not a seizure. Two cars are a seizure. Well, I mean, one car could be a seizure. One car is definitely, can definitely be a seizure. It's a show of force. And this court has to measure those. Well, to show up with a spotlight on a car at night, that's a show of force just for force because they have the lights on? Well, they pull up, one car pulls up behind the SUV. I guess that's a show of force, right? It's a show of force at any time. If you're on a highway and the highway patrol comes up behind you and tells you to pull over, there's a show of force, right? Exactly. It makes a reasonable person think they're no longer free to leave. And it's a high crime area where it's not unusual to have extra police in this task force. You're acknowledging that. I agree with that. But you've got an SUV with five people in it. That's correct. I'm just trying to draw some principled view of how we're going to analyze force on this seizure question. Sure. I think you look to, this is a parking infraction. So where is it on the spectrum? We know the officer why they stopped. One officer testifies, part of our initiative is look for smaller infractions. That's what this case is about, right? Whether you can target small infractions because you think there's something amiss going on of a criminal nature, right? I disagree that's what this case is about. But that is exactly what happened. We all know that's what they're doing. It says I'm looking for bigger and better things. But this case is about so much more. This case is not just about bigger and better things. This case is about what kind of force can the officers use, what kind of show of force can the officers use for a parking violation and how much do they need to observe. Because if you allow for reasonable suspicion to just be a four-second glimpse, seems like he's there, and everything else goes against it, the reasonable plausible thing is he's in the liquor store, somebody's in the liquor store getting a six-pack of High Light, and they're going to come out in a second. If we erase all that, then the Fourth Amendment means nothing at that point. It is no longer reasonable that what we're going to allow for you to seize for. And if we write it out just because it's a high crime neighborhood, that means we have two Fourth Amendments. And this incident is so big. That's why we're all here. What would you have done as a reasonable police officer under those circumstances? I would have been parked right on the right side, and I would have watched. I would have watched for two to three minutes, and I would have just seen what happened. That's what I would have done, and that's exactly what a reasonable police officer should have done. There was no need to seize for that parking violation. So we had, what, five unreasonable police officers? Well, I think you had one. You're the driver of the car. Everybody else is just following in line. The one guy who wants to – you know what? I want bigger and better. There's nobody else who's going out on the streets right now in this high crime neighborhood. Do you know what I'm going to do? I'm going to create something where I can go and look for something bigger and better. Nobody can be harassed when it's negative 20 because we're all bundled up. So they go and they find this minor parking infraction. That's not reasonable. Because think about it. If this case had gone up to the Supreme Court before Terry, would the Terry court have ever said, that seems reasonable? There they'd bend over backwards if they said 24 trips that the officer observed, and that was for a stick-up robbery. And they'd have flawed him. They said that's what a reasonable officer would do. That's good police work. They never would have countenanced this. If this was original Terry, 1968, going back to Loving v. Virginia, that's 50 years ago, nobody would have ever said, man, you know what, that seems reasonable. Your position wouldn't preclude, I assume, a state police officer on a highway, heading toward what we call a sore city, in a beat-up picket truck with an out-of-state plate and a taillight that's not as bright as it should be. And that pick-up truck is stylish. He's profiled because he thinks he's a courier. That's still going to be allowed, right? That state police officer in the middle of Illinois. They're still going to be able to pull him over, even though it's a minor infraction, but he really believes it's a drug courier. Well, yes. Brandon isn't changed by this case. And this case is Flora's case, with the license plate. All right, well, that's one thing. But if it's a burnt-out taillight, that's what hiring is. Okay, now, I think you're going to need to wrap up, Mr. Bugney, because we've been going on. But thank you very much. Mr. Alexander. Thank you. May it please the Court, my name is Keith Alexander. I represent the United States. To get to the question that was just asked, if this were to go to the Supreme Court, Terry would not have been the issue. The issue would have been Wren. The unanimous Supreme Court decision that held, and it specifically said, that courts should not try to distinguish between more important and less important violations that would justify an investigatory stop. What do we make of Hensley?  What do we make of Hensley? Hensley tells us that we have, in deciding whether a Terry stop is authorized, we have to balance the nature and quality of the intrusion, we all have heard about the details of that here, on personal security, against the importance of the governmental interests alleged to justify the intrusion. What are the governmental interests that justify this intrusion on the occupants of the vehicle? The government interest is to enforce the traffic law that they were investigating. The parking law. Well, it's interesting. I want to clarify something on that as well. The appellant is saying that standing is permitted, parking is prohibited. But the statute is very clear. It says, no person shall stop or leave your vehicle standing. It's interesting. Why did the statute add that extra phrase, or leave your vehicle standing? Because there are two different concepts in Wisconsin law. Standing is different than parking. Standing is the temporary halting of your vehicle. That's how the statute defines it. So if you pull up to a stop sign, you've temporarily halted your vehicle. That's a permissible standing. But parking is halting your vehicle, whether temporary or otherwise. So typically you think of somebody pulling their teeth out of the car, walking away, coming back at a later time. But what about the situation where two people in the car, maybe you're driving with your wife or something, and you stop next to a store, she runs in to get something. Now, are you violating the law by stopping for a minute so someone can run in and buy something? Well, I don't think my wife would be stopping for just a minute. Is that a violation of law or not? Yes, it would be. Well, that's ridiculous. Because the statute says. Well, that is ridiculous. I'm sure it's not enforced. Except in this case. If I pull up to a store and let my wife get out, when she's opening the door and walking to the store, yes, that is permitted. Because the statute says you can leave your vehicle standing if you're actually engaged in the receiving or discharging of passengers here. Okay? Once she's in the store, the door is closed. I can't just stay there until she's finished. You can't stay there forever, obviously. I can't just stay there until she's finished shopping and come back. What are you supposed to do? Pull forward 8, 9, 10 feet, park the car where it's legal to do so. There's an empty parking place in the area. Excuse me? An empty parking place. Everybody is doing this stopping, letting someone out for a minute or so. Yes. That's right. If I were to pull up to this crosswalk, let her out where the snow was not at so she could walk into the store and go in there and shop, she would close the door, and then I would drive forward. I couldn't just stay there until she finished shopping because that's what Wisconsin law says. No person shall leave your vehicle standing. The question that's unanswered. Unless you're loading and unloading and discharging and receiving passengers. Actually engaged in that activity. That is correct. Given that the parking prohibition in this case is generally enforced by the Department of Public Works, not the police, that it can only result in a $30 fine and no criminal liability and cannot be the basis for a warrantless arrest. I mean, isn't it clear that the government interest in this case is really minimal? And where the interest is so insignificant. How can any intrusion on the individual's rights be reasonable when the less intrusive means of enforcement was not even attempted first? I think part of the question is answered directly by the Unanimous Supreme Court in Wren. In Wren, it was an undercover officer who was attempting to pull over somebody for a civil traffic violation. But remember, in Wren, the Supreme Court said that there was actually even probable cause. Now, maybe high end down shifts to reasonable suspicion. But the backdrop against which the court wrote all of that in Wren was one in which the officers had probable cause. That is correct. That is absolutely correct. They had probable cause. The magistrate court here found that there was probable cause. But in Wren, the DC police manual said that undercover officers typically were not supposed to be making traffic stops only in emergency or urgent situations. That didn't matter to the Unanimous Supreme Court in Wren. So it shouldn't matter here. So your argument is that the level of the government interest makes no difference. If in downtown Chicago all of the police decide we really need to crack down on jaywalking, so we're going to arrest and Terry Frisk every person who we think is about to cross the street without the little white light on that says you can cross. So we can all just be stopped now. That's fine with you, even though, you know, because there's a law that says don't jaywalk. Up to and including, you know, somebody who's planning a murder. But you think that the government interest means nothing. Well, I think I do. Well, let me answer it this way. In Wren, the Supreme Court said courts are not generally supposed to be balancing, doing the balancing, because it would be apparent. Because like you said, when there's probable cause for the stop, absent extraordinary circumstances, courts shouldn't be balancing. The thing is, what worries me about your position, aside from the fact that, you know, it seems to give the police a blank check to stop anybody at all times for no reason at all, but the other thing that worries me about it is that if there's no correlation between the level of force the police are allowed to use and the significance of the government interest, you know, the police could have shot out all the tires of this car. They could have tossed a grenade into it. They could have done anything. And as far as you're concerned, that doesn't matter. Whatever level of force they want is all fine. No, that's not my position. And Wren says, in extraordinary circumstances like that, they don't need to engage in the balancing. Well, then how do you justify the lights? Excuse me? The lights. The stop lights? The squad car lights? The squad car lights. Yes. I mean, imagine, how would you feel? You're in the night, winter, so on, all of a sudden you're surrounded by police cars and there's lights flashing. I mean, most people would be very upset by that. Well, the squad lights, the squad cars. And what reason do they have? Is there no other way for them to find out what's going on? One of them could have walked into the liquor store, see what's going on there. Could have driven around the block. Could have just sat there for a little while waiting for someone to come out of the liquor store. Why did they have to act with such, you know, excessive force? The spotlights were used to see who was in, if there were people inside the vehicle and how many. There's no claim by the appellant that that was an unconstitutional act by the police. From Randy Johnson's perspective, whose Fourth Amendment interests. I think that's fine. Police just go off with their flashing lights at night looking in to see who's there, you know? Maybe there's somebody in there. Dunn versus United States says that you can. That's not a right way to run a police force. Well, Dunn versus United States. What's the dislike of the police? You can understand why when they overreach like this. Well, the reason why they were able to use a stoplight here is because they are able to illuminate what otherwise would be in plain view for anybody walking by there. In addition, officer safety is critical here. The Supreme Court. Officer safety? Yes. Why don't they just sit in their car on the opposite side of the street, the other side of the street, and wait to see if someone comes out of the liquor store? And if there's a delay, then okay, they should probably just go into the liquor store, see if there's someone, you know, shopping there. Who's in this car. They could say, look, make your purchase and go back to the car because it's sitting there for too long a period of time. And that's what may have happened if they would have got to that point. But the magistrate court's finding of fact was very clear. They got to that point. All they had to do was one of the cops get out of his car, cross the street, walk to the liquor store, see what's going on, peek in the car if he wants. Why is that such a big deal that they have to resort to these flashing lights in their vehicles? Well, as to the point of whether they should have waited a couple more minutes, there's no requirement under the Fourth Amendment they have to do that. They can be as stupid as they want. That's your position. They can't be required to be reasonable. You can't do that. I'll let you give your position and then maybe Judge Williams has a question. My position is based on the whole line of precedence that say the purpose of an investigatory stop is to resolve any ambiguity. We're not talking that they don't even need to have anything close to preponderance of the evidence to conduct an investigatory stop. What's the ambiguity? What did they think was going on? A theft from the liquor store or what? There was no ambiguity because the car was clearly stopped well within 15 feet. It was stopped because someone was going in to buy liquor. That was clear enough. So what's the mystery that required this deployment of force with these flashing lights? Two things. One, the fact that somebody went into the liquor store to purchase liquor, that was not on the record. Okay, that's first. Secondly, as I said. Well, it's the obvious inference from a car stop next to a liquor store at night that someone in the car did it. I think maybe we better stick with the record here. So is your bottom line that any time the police have a parking violation like this, that they don't have to wait at all? They can surround the car. They can do that. So just the mere fact of a parking violation, they wait just a few seconds and boom, they're in there. They can go in and surround the car, do whatever they need to do. Is that the rule you want us to adopt? Well, given the fact here, I think, given the circumstances that the officers observed here, they could take up to 58 feet. Three seconds. That's all they did. They just saw the car was parked and it was not within that 15, it was beyond, it was inside that 15-foot perimeter. That was it. And that's all they had, three seconds. So you couldn't even determine whether it was there to load or not load or anything. So that's what I want to know. What kind of rule you want us to adopt? Because it sounds to me like you're saying it's a parking violation, all they need to do is wait two or three seconds, and boom, they can then take further steps to investigate. Well, they also saw that no doors were open or closed. They also did not see anybody approaching or leaving. Well, they didn't have time to. It was only three seconds. And I just want you to clarify what your position is on this. Mr. Bugney said that when they make the initial decision to zoom in with the two cars, they do not at that point have enough of a sight line to know whether there's anybody sitting in the driver's seat, whether there's anybody, in fact, inside the car. They make the decision to surround the car, and it's only then when they get out that they see, well, there's nobody in the driver's seat, there are these other people. Is that your understanding of the record? That's correct. They saw that the vehicle was on. So they could reasonably assume. They could tell you it was running, but for all they knew at that moment, maybe there was a person sitting behind the steering wheel. Maybe there had been a passenger who had run inside. Yes. They saw the vehicle was on. So you agree that those are later developed facts. Okay. Yes. And on the point of what they saw, it was very clear in the record. The magistrate court made this factual finding. Officer Conway saw Randy Johnson pulling out a gun before anybody saw it, before any officer. And that's after the stopping, though. I think you're right. The stop is okay. Exactly. According to the findings of fact by the magistrate judge, Officer Conway made those observations. I know that there was a contest about that, but that's the fact that the magistrate judge found. So unless the stop is wrong, it's hard to see how the rest of it doesn't unfold. Yes. And I just want to emphasize that point because much is made about excessive force. Officer Conway, let me put it this way. From Randy Johnson's perspective, whose Fourth Amendment interests we're concerned about, he is sitting in the middle row of this SUV, sitting by a window. He observes a squad car pull up next to the car. He might see the other one behind it. He probably notices the spotlight. He does notice the spotlight shining in. And that lasts seconds before Officer Conway sees him pulling a gun out. This is not an excessive display of force, especially considering the fact that the Supreme Court in Maryland v. Wilson said that officers can direct people, all the people in the vehicle, out of the vehicle for nothing more than a minor traffic violation. It was nothing more, given the concern for officer safety. So now do we have a situation where in the streets of any of our major cities, since a certain number of cars are going to be overstaying their welcome at a parking meter, that the officers can just go down car by car and command everybody to get out of the car? It might be violating the law, after all. It might be parked illegally because the meter expired. Well, if they observe somebody violating the parking law, they can certainly stop them for a long enough period of time to write a ticket. But you're saying they can also order them out of the car and they could also block the car's access to the road, and they can also perhaps take other forceful measures. Maryland v. Wilson is squarely on point that officers can direct all the passengers out of the vehicle. Well, in the special context of traffic stops, we obviously have special rules. The Supreme Court has developed special rules, as in Wren, as in Wilson, for moving violations. And to stretch those to parking practices is something the Supreme Court has never done. And I have to say, as I obviously said in the panel dissent, it would really be an extraordinary extension in terms of what could happen on the streets of our cities. First of all, I don't think it would be an extension of Wren at all. I don't think so at all. Because every federal circuit that has considered the issue has held that Wren applies to parking violations. If courts start doing what Wren directed courts not to do, which is trying to distinguish between what's more important or less important, we come up with unworkable standards. What do we do with Hensley and the general reasonableness standard under Terry, which tells us to worry about governmental interests? What I'm suggesting is that that analysis takes on a special tone, a special cast in moving violations, as in Wren, and extended to a lot of situations with traffic stops. But a more fundamental approach under the Fourth Amendment that is protective of individual liberty and privacy would say that we do not want to go to the scenario that Chief Judge Wood just described with jaywalkers or people sitting in parked cars by expired parking meters. Well, I think what would happen was if this car was operating, parked, and stopped, and it wasn't a license plate or the registration was expired, the officers would be able to conduct an investigatory stop pursuant to this court's precedent, Miranda Sotolongo being the most recent. So the fact that it's moving or not moving doesn't matter for equipment violations. In Cashman, this court upheld an investigatory stop of an excessive crack in a windshield. If the person's operating and happened to have their car stopped and they noticed a 10-inch crack in their windshield, this court has held in Cashman that they could do an investigatory stop. Moreover, this particular statute, as I indicated earlier, prohibits parking and standing, which are two separate concepts under Wisconsin law. Standing is actually treated under Wisconsin law as a moving violation. Parking is a non-moving violation. If we try to draw these distinctions and become the first federal circuit court since Wren to do that, we're going to come up with all types of unworkable tests that just will not be clear when the violation is serious enough or not. So I think Wren counseled us. I think this court should take Wren into account. The Sixth Circuit case, the Ninth Circuit case on this issue, also is instructive. Those were clearly parking violations. The questions they asked were, was this a traffic violation under the state law, and two, whether the officer had authority to investigate or enforce that law. The answer to both questions, given those particular state statutes, was yes. The affirmative response is the same here. It's a yes. This law is a state statute under Chapter 346 entitled Rules of the Road, the same chapter that governs stoplight violations, lane deviations, other traditionally understood traffic violations. The state of Wisconsin treats this as a traffic violation, and the officers clearly had authority to enforce it. So following the reasoning of Cowdery, following the reason of Copeland, this court should likewise not try to embark on the exercise of distinguishing between what's more serious and less serious, particularly here, when this statute is within the very chapter of the Wisconsin Code regulating traffic violations. So could jaywalking be deemed a traffic violation? I don't know for sure. I would think not. Why not? Because it's not obvious. No, no, it's very dangerous. You have jaywalkers, cars screech to a hall, going behind and hits them. I don't know. Jaywalking interferes with smooth traffic management. To answer your question directly, I don't know if Wisconsin law treats jaywalking as a traffic violation or not. I understand. But if it did, and the officers were to stop somebody, the Terry stopped somebody, there would be a significant difference. They would be able to see the person in front of them. They would be able to see their hands. Not so when they're conducting even the minor traffic violation. As Marilyn versus Wilson said, the Supreme Court decision, they cited this statistic. Now, it's older. It's 1994. Eleven officers were killed. Over 5,700 were assaulted in traffic-related stops or pursuits. Now, that's Wilson. That's a 1997 case. It's citing statistics from 1994. But it illustrates something that I think, at least I don't often consider. When an officer is pulling up, they are facing an inherently dangerous situation. They can't see people's hands. And that's why the Supreme Court has said that the officers should take unquestioned command of the situation for their safety. They could direct passengers who aren't committing any violation whatsoever out of the vehicle for their safety. The officers here never even got to the point of ordering Randy Johnson out of the vehicle, because he immediately showed the officers that he was trying to hide a gun. And that completely changed the landscape. So for the few seconds that he was seized, the few seconds that he saw a squad car and some lights in, that was the level of intrusion on Mr. Johnson, his Fourth Amendment interest we're talking about. Ordering him out of the vehicle would have been a much greater intrusion. And that is specifically allowed by the Supreme Court in Maryland v. Wilson. Do you think courts should simply ignore that the seizures in this case are targeted toward only certain populations? You know, here residents of high-crime, low-income areas, and are utilized to pursue interests that certainly seem to be unrelated to any concern with parking violations. And when used systematically in that manner, shouldn't we at least refuse to extend REN to such situations and prohibit seizures in which the parking violation certainly seems pretextual? So are you asking the questions about race? Well, it's about the neighborhood, et cetera. In the Supreme Court, the unanimous court in REN addressed that very question. They discussed it. And they said that, because that was a concern for any traffic violation, unregistered license plate, cracked windshield, whatever it may be, that's a concern. And the Supreme Court unanimously said that that is an equal protection violation. No question that would, if somebody is enforcing the law based on race or investigating based on race, that is a violation of the Constitution. How many successful cases can you think of that have pursued that theory? I can't, I don't know. Would that be zero? My next question. I don't know the answer to the question. But what has been clear is that the Supreme Court addressed that very question and unanimously said it doesn't matter in the context of the Fourth Amendment. The subjective intent of the officers is out of bounds for regard to the Fourth Amendment. The question is what objective facts they observed and whether those objective facts lead to probable cause or reasonable suspicion to believe that there might be a traffic violation occurring. With regard to balancing, you know, I think it is also instructive that the Supreme Court doesn't seem to be backing away from REN, but seems to actually be embracing it. The High End decision recently demonstrates that. There the Supreme Court in an 8-1 decision upheld the stop of a vehicle when the officer was wrong about the law. The officer thought that if one brake light was out rather than two, that that would be a violation of North Carolina law. The officer was wrong about that. The court said that so long as the mistake was reasonable, the stop was still permitted. That was an 8-1 decision. There was no balancing of the government interest in this mistaken understanding of the law that the officer was trying to enforce versus the intrusion of the person's liberty when he was seized for the officer's mistaken violation of the law. Rather, the question was simply whether the mistake of law was reasonable based on the observations of the officer. So the Supreme Court, and that was a reasonable suspicion case. The Supreme Court, despite using the reasonable suspicion case in High End, did not do this balancing that the appellant is inviting this court to do to look at the seriousness of this particular violation versus the intrusion upon the appellant's liberty. There's always something about this line of Supreme Court decisions and the question how much do they really encompass and how much are we being asked to push them beyond their original boundaries is the question whether there are actually any meaningful limitations on police behavior in this. And I take it from your argument that the answer is really no. We just have to have good and trustworthy police officers. I think the answer is yes. I think there are extraordinary cases, Ren talks about this, where that would then invite the balancing test. But you're saying, what's an extraordinary case? Is that 1% of cases? The rest of the time, since this is an objective test and subjective motivations don't factor into it, there's really no limitation. I think the examples you gave would be limitations. If the officer shot out all the tires that they threw a grenade in, those would be extraordinary. Those are examples that you raised earlier. Those would be extraordinary. And that would be something that Ren says we should look into. But the typical traffic stop, that isn't the case here. And the Fourth Amendment doesn't specify how many officers are supposed to enforce a parking violation. It calls for reasonableness. And so if we went down that path of saying, well, one squad car instead of two or four officers instead of five in this particular circumstance are permitted, we would create an unworkable rule that would not give police guidance as to when they do it. Excuse me, I'm sorry. The issue is less the number of officers or cars as the show of authority that makes it clear that nobody is free to walk away. And that's really the critical point, it seems to me. We have a seizure. Was there a foundation for it? And so thank you. Yes, and I agree. In the seizure here, the showing that they were not permitted to move, the seizure, prior to Randy Johnson showing the gun was the following. Two police squad cars make a left-hand turn. They pull up to the car. The officer asks, did you run out of the car? Answer, no. Did you jump out of the car? Answer, no. They approach the vehicle. And before Officer Conway, he testified to this, as he's getting out of the squad car, he observes Randy Johnson with a gun. He's not even completely out of the squad car. Those aren't the findings. The findings that we are left with were that he saw a furtive movement. He believed what he thought it would be. Turned out he was right. But the critical point is, there is a seizure of everybody in the car, including Johnson. And the question is, what is the factual legal foundation for that seizure? That's the focus. And that's what we've got to remember. And for the level of the seizure, what I'm saying is that when Randy Johnson completely changed his Fourth Amendment interest when he was observed with a gun, that occurred as Officer Conway was getting out of the vehicle. He wasn't even, he was just approaching the vehicle. I would agree he was already seized at that point. Yes. For a few seconds. Yes, he was. Thank you. And then what's your best argument that the gun would have been discovered if the seizure had been less aggressive? In terms of facts, we don't know on this record whether he had the gun in his pants, under a coat, or anywhere that an officer couldn't see it. So how do we know it's inevitable? If it had been a less aggressive seizure. The government didn't make that argument below. The panel, I think, decision on that, though, is justified and can be reasonably inferred from the fact that Randy Johnson, upon seeing the police, his first reaction was to get that gun off of his person. That was his first reaction. He didn't, and so whether it was one squad car or two squad cars or three officers or one officer or an officer coming up and flashing a light in, one can reasonably infer from this record that he would have done the same thing, tried to get that gun off of his person. Suppose there hadn't been a gun. What would have been the next step? The next step would have been to ask, why are you stopping here? The officers testified to that fact. If they would have said somebody is in the store shopping, I think the option then the officers would have to face is either to issue a citation for illegal standing or say, why don't you just move forward eight feet and I'll give you a warning and be on our way. It could have been over in a matter of a minute or two. But Randy Johnson didn't even give him a chance to ask that simple question. You said that one of the, your brief says that one of the occupants had a driver's license. Which occupant was it? I don't know standing here. Somebody other than the driver? Somebody other than the driver, yes, that's correct. I see I'm out of time. Unless there's any other questions, I will rest on the government's brief and ask the court to affirm the district court's denial of the motion to suppress. Thank you. All right. Thank you very much. And you more than ran out of time, Mr. Bugney, but it was because we were asking you a million questions. So if you really want to take one minute and one minute only, I will give it to you. Really want to. I'm tiny. I appreciate that. I'll actually keep it real short unless there are questions. I would just ask, I know I filed it late. Part of it was a Thanksgiving weekend. But I filed a 28-J letter on Monday addressing the government's concerns. I think he's wrong on whether or not a parking violation is a moving violation. I cited, I guess, the leading treatise on traffic violations in Wisconsin, leading being the only one. I think we're pretty firm on this point. This is a parking violation. There's no reason to analogize it to anything else. If there's anything else, Your Honors, thank you. We ask that you reverse and remand. We thank you very much. Thanks to the government as well. The court will take the case under advisement, and we will be in recess.